**IT IS ORDERED as set forth below:**

**Date: March 31, 2021**

_____

**Jeffery W. Cavender**
**U.S. Bankruptcy Court Judge**

---

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE: | CASE NO. 20-68333-JWC |
| ADRIAN MARIE WELLS-LUCAS,<br><br>Debtor. | CHAPTER 7 |
| SHANNON M. YOUNG,<br><br>      Plaintiff,<br>v.<br><br>ADRIAN MARIE WELLS-LUCAS,<br><br>      Defendant. | ADVERSARY PROCEEDING NO.<br><br>20-06196-JWC |

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Defendant's Motion to Dismiss Amended

Complaint and Memorandum of Law in Support (Doc. No. 6) (the "Motion") filed by Adrian Marie

Wells-Lucas ("Debtor" or "Defendant") pursuant to Rule 12(b)(6).[1]

## I.      BACKGROUND

Debtor filed for relief under chapter 7 of the Bankruptcy Code[2] on July 22, 2020. The deadline to object to discharge and challenge the dischargeability of certain debts was October 26, 2020. On that date, Shannan M. Young ("Plaintiff") timely filed a Complaint (Doc. No. 1) (the "Initial Complaint") to except from discharge debts allegedly owed to Plaintiff pursuant to §§ 523(a)(2)(A) and (B), 523(a)(4), 523(a)(6), and 727(a)(4) and (7). Defendant filed a motion to dismiss the Initial Complaint on November 24, 2020. Plaintiff filed the Amended Complaint for Nondischargeability of Debt on December 8, 2020 (Doc. No. 4) (the "Amended Complaint") adding various factual and legal allegations but seeking to except debts from discharge on the same grounds as the Initial Complaint. Defendant then filed the instant Motion seeking dismissal of the Amended Complaint in full with prejudice for failing to state a claim for which relief can be granted. Plaintiff filed a Memorandum of Law in Opposition to the Motion on January 4, 2021 (Doc. No. 7) (the "Response"). For the reasons stated below, the Court will grant the Motion in part and deny the Motion in part.

## II.     STANDARD OF REVIEW

Dismissal of a complaint is appropriate if it fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). This Rule is construed with Rule 8(a), which provides the "normal" pleading standard that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This standard "does not

---

[1] All references to "Rules" are to the Federal Rules of Civil Procedure as made applicable by the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") unless otherwise specified.

[2] 11 U.S.C. § 101 *et. seq.* All statutory references herein are to the Bankruptcy Code unless otherwise specified.

require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). It is not sufficient that the pleadings merely "le[ave] open the possibility that the plaintiff might later establish some set of undisclosed facts to support recovery." *Twombly*, 550 U.S. at 561. "[D]etermining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense." *Iqbal*, 556 U.S. at 679.

Rule 9(b) provides for a "heightened" pleading standard in the case of fraud. Allegations concerning fraud must be pled with particularity, but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "Rule 9(b) is satisfied if the complaint sets forth '(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.'" *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007) (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)). The Eleventh Circuit, however, has "acknowledged that 'alternative means are also available to satisfy the rule' in substantiating fraud allegations." *Tello,* 494 F.3d at 972-73.

The Court restricts its inquiry to the legal feasibility of the allegations in the complaint and whether they set forth facts as opposed to labels or mere conclusory statements when considering

a motion to dismiss. *See Howell v. U.S. Foods (In re Bilbo)*, 2014 WL 689097, at *3 (Bankr. N.D. Ga. Feb. 5, 2014) (citing *Iqbal*, 556 U.S. at 678). After determining which allegations in a complaint are well-pled facts and which are legal conclusions, a court must accept all well-pled facts as true and must construe those facts and the complaint in the light most favorable to the plaintiff. *Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319, 1324 (11th Cir. 2017); *Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 856 F.3d 1338, 1339 (11th Cir. 2017).

Here, Plaintiff's claims under § 523(a)(2)(A) and (B) and the claims of fraud or defalcation while acting as a fiduciary under § 523(a)(4) are governed by the heightened pleading standards of Rule 9. Plaintiff's claims for larceny and embezzlement under § 523(a)(4) and the claims under § 523(a)(6) are governed by Rule 8. Plaintiff's claims under § 727(a)(4) and (7) are governed by a mix of Rule 8 and Rule 9, but the distinction is not relevant to this opinion.

### III. **FACTS**[3]

Plaintiff was introduced to Debtor by Plaintiff's best friend. Plaintiff attended an "AirBnB cashflow seminar" given by Debtor and had a follow-up conversation on April 9, 2019. During that conversation, Debtor explained that by renting a property in her company's "winning" platform, Plaintiff could receive an immediate return on her investment without having to establish her own property. By making an investment in a property, Debtor could make upgrades to achieve "AirBnB plus status" faster to further increase profits and bookings. Such transition was the primary goal of Debtor's program. Plaintiff began considering a specific property on the platform and was given information that the property had over fifty reviews, immediate and consistent cash flows, and generated approximately $30,840.62 in the first three months of 2019 excluding

---

[3] All facts are taken from the Amended Complaint and attachments thereto unless specifically indicated otherwise. Solely for purposes of ruling on the Motion, the allegations in the Amended Complaint are accepted as true except where specifically indicated otherwise.

overage from the Super Bowl. Debtor stated that an established property reassured minimal to no risk in the investment and that a "Set Up Fee" from Plaintiff would allow Debtor to make upgrades to the property, including new furniture, that would significantly increase the value of the property and possibly increase monthly income by $2,000 to $4,000. The improvements were to begin immediately upon payment of the Set Up Fee. Debtor encouraged Plaintiff to move forward soon to take advantage of the peak months of May through August. When exactly these conversations and representations took place is unclear, but, construing the facts in the light most favorable to Plaintiff, the Court can reasonably infer they all occurred sometime between April 9 and April 15, 2019.

Plaintiff performed a thorough internet search of Debtor, which revealed numerous events and seminars hosted by Debtor and numerous testimonials, reviews, and videos describing Debtor as a powerhouse, a former CBS affiliate, and a well-spoken, well dressed, educated "mompreneur" providing the best in luxury services. Debtor told Plaintiff she wanted to empower and teach young minorities how to succeed in real estate and business to gain generational wealth and become their own bosses. Satisfied with her research and Debtor's pitch, Plaintiff proceeded with a potential investment.

The Amended Complaint alleges "[o]n April 12, 2019, the Plaintiff/Creditor and Debtor/Defendant entered into a contract setting out the scope of our business relationship including a breakdown of the business venture." A footnote in the Amended Complaint references an "Exhibit 'B' Contract." The attached Exhibit B includes two contracts titled (1) "The Lucas Luxury Group aka the Wells Luxury Group, LLC Rental Arbitrage Agreement" (the "Rental

Agreement") and (2) "Arbitrage Co-Host-Hosting Agreement" (the "Hosting Agreement"[4]). Both attached contracts, however, are dated April 15, 2019—not April 12—and the only parties to the contracts are Plaintiff and The Lucas Luxury Group aka the Wells Luxury Group, LLC ("Luxury Group")—not Debtor. The exact relationship between Debtor and Luxury Group is not clear, but the Amended Complaint alleges the property in which Plaintiff ultimately invested was through Debtor's company.

On April 14, Plaintiff viewed the property in which she would ultimately invest. On April 15, Plaintiff and her friend emailed Debtor detailing Plaintiff's expenses and a projected break-even analysis using "worst case scenario" numbers and asking if her projections were accurate. Debtor responded that "the breakeven point would be a lot faster even with more conservative numbers." Plaintiff expressed concern with the language of the presented contracts and spelled out other concerns, including Plaintiff's need to have a return on her investment, the need to recover the $15,000 Set Up Fee and $7,200 Deposit as soon as possible, and that Plaintiff was not working full time, was starting her own business, and took out a personal loan to make the investment. Debtor responded that she was confident in her ability to produce results, referencing her time and energy devoted to building her "winning" brand. During a follow up phone call Debtor agreed to change her fee from a 70/30 split to an 80/20 split so Plaintiff could recoup her investment more quickly and achieve a win-win for everyone. Based on this conversation, Debtor sent a new contract, which Plaintiff accepted on or about April 15. It appears the contracts attached to the Complaint are the contracts signed on April 15, which again raises the question of whether any contract was signed on April 12. Plaintiff paid $8,500 via PayPal on April 15 and wired "her"

---

[4] The Hosting Agreement attached to the Amended Complaint is missing several pages, but the entire agreement is attached to the Initial Complaint. The Court considers the entire agreement attached to the Initial Complaint.

$16,850 on April 16 for a total of $25,000. The initial investment pursuant to the contracts was $23,150, and the $1,850 overage was rectified in May.

The specifics of the agreement can be gleaned from the attached contracts. In the Rental Agreement, Luxury Group granted Plaintiff the "exclusive use" of property located at 1227 Atlantic Dr. NW, Atlanta, GA 30318 (the "Property") from April 15, 2019 until April 30, 2020 in exchange for monthly lease payments of $3,600. The Rental Agreement required a deposit of $7,200 due in advance and to be returned after the term of the Rental Agreement (the "Deposit"). The Rental Agreement also required Plaintiff to put all utilities in her name but makes clear that all furnishings belong to Luxury Group. Despite being granted the "exclusive use" of the Property, the Rental Agreement goes on to prohibit Plaintiff from using the Property for personal use, prohibits Plaintiff from making any changes to the Property without the permission of Luxury Group, and provides that "all parties are aware and agree that current short term rentals are accepted at the [P]roperty."

The Hosting Agreement, in turn, contemplates that the Property will be booked for short-term rentals through various online platforms such as Airbnb and VRBO with the revenues to be split between Plaintiff and Luxury Group—80/20 for six months and then 70/30 after six months. Generally, Luxury Group was to handle all aspects of booking and managing the Property while Plaintiff was required to cover certain costs associated with renting the Property and an up-front fee of $950 to be added to Luxury Group's platform (the "Platform Fee"). In sum, the contracts outline an arrangement by which Plaintiff paid Luxury Group for the right to share in a percentage of revenue generated by the Property, but Plaintiff otherwise had little rights or responsibilities with respect to the Property.

The Host Agreement contains the following clause (the "Merger Clause"):

> This Agreement is fully integrated. It constitutes the entire agreement of the parties relating to the subject matter addressed in this Agreement. This Agreement supersedes all prior communications, contracts, or agreements between the parties with respect to the subject matter of [sic] addressed in this Agreement, whether oral or written.

"This Agreement," which is a capitalized term in the Merger Clause, is defined in the Hosting Agreement as the Hosting Agreement itself and does not appear to include the Rental Agreement or any agreement other than the Hosting Agreement. Further, the contracts neither reference nor incorporate each other. The Rental Agreement references Co-Host Agreement Rules and Regulations "outlined in a separate agreement," but it does not appear to be the Hosting Agreement, and it is not clear what this other agreement might be.

Attached after the contracts is an invoice dated April 13, 2019 from Luxury Group to Plaintiff and signed by Plaintiff on April 15. The invoice references the Property address and shows $7,200 due for "Deposit," $950 due for "Airbnb Platform Fee," and $15,000 due for "Property Set Up Fee." The Deposit and Platform Fees are explicitly required by the contracts, but nothing in either contract references a "Property Set Up Fee" or any amount due for $15,000. Thus, the Set Up Fee appears to be governed by some other arrangement not expressly contemplated in either contract.

Suffice to say, the Property did not perform as expected. Plaintiff earned $45 in April and $1,070.83 in May. Plaintiff lost $1,213.64 in June as bookings were not enough to cover rent. Plaintiff earned $1,702.36 in July, but that profit was the result of Debtor not charging rent for July after Plaintiff complained the Property was not performing as expected. There were no bookings in August. After rent, utilities, and other fees, Plaintiff earned $1,604.55 from April to July, but that number was reduced to $739.61 after the August power bill of $745.66 and gas bill of $119.28.

8

Plaintiff began raising concerns at the end of May and exchanged several emails with Debtor over the next few months. In July, Plaintiff was offered the option of taking a different property or getting out of the agreement with a return of only the Deposit to be paid out of future rental proceeds. Plaintiff refused and requested a refund of her full investment and the outstanding utility bills in one lump sum. Debtor eventually proposed a settlement for $15,000 and attempted to make payments to support such settlement, but Plaintiff refused any payments and apparently shut down her PayPal account to stop any attempted payments. Plaintiff threatened legal action, and Debtor filed her chapter 7 petition a few months later.

At the time termination discussions were ongoing, the Amended Complaint alleges Plaintiff discovered the Georgia Real Estate Commission started an investigation of Debtor in or around September 2013 pursuant to O.C.G.A. § 43-40-27. To avoid an investigation, Debtor surrendered her brokerage license, and the Commission revoked both Debtor's real estate brokerage license and The Wells Luxury Rentals LLC's brokerage firm license on October 21, 2013. Plaintiff alleges that pursuant to Georgia law, the revocation of those licenses prevents Debtor from engaging in a variety of professional activities related to real estate. Debtor never disclosed the revocation of the licenses or that she was not authorized to engage in certain activities. The Amended Complaint alleges Debtor fraudulently marketed herself as a real estate expert/agent with over thirty years of experience at the time of the contracts. Plaintiff alleges Debtor was not authorized to enter the contracts, had a duty to disclose her revocation and unauthorized status, and failed to disclose the information. Plaintiff would not have entered the contracts had she known about the revocation and would have conducted a more thorough investigation of Debtor's affairs.

The Complaint makes a few additional allegations in several subparagraphs to numbered

9

paragraph 9. These allegations are important but are difficult to place within the timeline and overall narrative. The Court quotes them below with some observations.

At some point Debtor provided a "typed ledger detailing the past performance of the property . . . which proved to be an inaccurate depiction of the financial condition of the [P]roperty and of other properties offered by" the Debtor. "These statements together were sent to deceive Plaintiff[ ] and to further induce her to enter into agreement with" the Debtor. Though it is not entirely clear, the Court construes this ledger to be the document showing $30,000 of revenue for the Property in the first three months of 2019.

In paragraph 9.c., Plaintiff alleges the following:

> Debtor effectively 'stole' the Set-Up Fee that was charged for the purpose of making property upgrades and improvements to obtain AirBnB plus status by June 2019 as evidenced by email correspondence sent on April 15, 2019. To date such upgrades and improvements as evidenced by the current listing on AirBnB were never done and accordingly the transition to AirBnB plus status never occurred.

The allegation that the Set Up Fee was stolen is a legal conclusion, but the allegations that the property upgrades have not occurred is relevant to the claims alleged.

In paragraph 9.d, Plaintiff alleges the following:

> Debtor has been previously litigated by the property owners and on multiple occasions was subsequently evicted. The Plaintiff/Creditor was able to locate 2 separate reviews from parties also named as Creditors in the Defendant/Debtors current bankruptcy case alleging that they were not paid rent and how she was nonresponsive. This is relevant because, the Defendant/Debtor charged clients like the Plaintiff/Creditor rent even during months when the property did not perform. As such, it can be inferred that there would be no reason for the Defendant/Debtor to not pay rent to the property owners unless she was misappropriating the finances on both ends of the transaction. Such defalcation created a debt that would not have otherwise occurred but for her fraudulent dealings.

The Court is not entirely sure what to make of these allegations, but they suggest the Property and other properties in Debtor's portfolio were not owned by Luxury Group or Debtor. Instead, owners

of the properties leased them to Luxury Group/Debtor, who then subleased them to investors like Plaintiff.

Finally, in paragraph 6 on page 4, Plaintiff alleges the following:

> The Defendant/Debtor also provided the Plaintiff/Creditor with numerous emails before and during the course of their business relationship regarding this matter and it seems as though there has been issues relating to the business contract from the start. Specifically, from the time the Plaintiff/Creditor met with Defendant/Debtor, she conveyed to the Plaintiff/Creditor "100% passive income, consistent monthly income stream, quit my 9:00 a.m. to 5:00 p.m., make six figures in one year, etc.," which is supported by the Defendant/Debtor's weekly emails that she sent out to the Plaintiff/Creditor regarding her property.

It is not clear when these alleged emails were sent or received. It is also not clear whether the quoted language regarding 100% passive income, etc., was a part of the emails or was separately conveyed to Plaintiff.

## IV.   LEGAL ANALYSIS

### A.   Section 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). To except a debt from discharge under this section, Plaintiff must prove the following elements: "the debtor made a false statement with the purpose and intention of deceiving the creditor; the creditor relied on such false statement; the creditor's reliance on the false statement was justifiably founded; and the creditor sustained damage as a result of the false statement." *Fuller v. Johannessen (In re Johannessen)*, 76 F.3d 347, 350 (11th Cir. 1996); *see also Washington v. Robinson-Vinegar* (*In re Robinson-Vinegar*), 561 B.R. 562, 566 (Bankr. N.D. Ga. 2016) (Baisier, J.); *In re Presley*, 490 B.R. 633, 638–39 (Bankr. N.D. Ga. 2013) (Diehl, J.). As decisions in this district have noted,

> This exception to dischargeability addresses deceit or artifice rooted "in a specific intent to mislead, trick, or cheat another person or entity," and the intent to deceive may be shown using circumstantial evidence in relation to the totality of a situation. *Beyond affirmative misrepresentation, fraud may consist in intentional silence or concealment of a material fact.*

*In re Robinson-Vinegar*, 561 B.R. at 566. "[A] failure to fulfill a promise is not sufficient." *Blosser v. Boggus (In re Boggus)*, 479 B.R. 147, 155 (Bankr. N.D. Ga. 2012) (Brizendine, J.); *see also Invest Atlanta Regional Center, LLC v. Smith (In re Smith)*, 578 B.R. 866, 876 (Bankr. N.D. Ga. 2017) (Baisier, J.). The debtor must have entered the agreement either knowing the debtor could not, or did not intend, to perform. *Boggus*, 479 B.R. at 155.

Debtor argues Plaintiff fails to state a claim under § 523(a)(2)(A) because Plaintiff failed to plead with particularity any specific false statements intending to deceive Plaintiff at the time of signing the contracts. The Court agrees most of the allegations involve generalized statements of opinion that "do not relate to existing fact and are not actionable.'" *Bankers Healthcare Grp., LLC v. Moss (In re Moss)*, 598 B.R. 508, 515 (Bankr. N.D. Ga. 2019) (Ellis-Monro, J.) (citing *Kuper v. Spar (In re Spar),* 176 B.R. 321, 327 (Bankr. S.D.N.Y. 1994)). The allegations about "100% passive income, consistent monthly income stream, quit my 9:00 a.m. to 5:00 p.m., make six figures in one year, etc.," are not pled with particularity in that it is not clear when they were made, how they were made, or if they were even false or misleading. Other allegations about Debtor's confidence in her brand, the platform, and the success of the investment equally lack particularity and fall under the category of opinion.

But as case law makes clear and Plaintiff points out in her Response, claims under § 523(a)(2)(A) are not limited to affirmative false statements. False pretenses "may be implied from conduct or may consist of concealment or non-disclosure where there is a duty to speak." *Old Republic Nat'l Title Ins. Co. v. Presley (In re Presley),* 490 B.R. 633 (Bankr. N.D. Ga. 2013)

(Diehl, J.); *see also In re Robinson-Vinegar*, 561 B.R. at 566.  Plaintiff alleges Debtor's real estate

brokers license was revoked in 2013 and attaches the revocation order to the Amended Complaint.

As such, Debtor may not act as a real estate broker under Georgia law. O.C.G.A. § 43-40-30.

Georgia law defines a broker as "any person who, for another, and who, for a fee, commission, or

any other valuable consideration or with the intent or expectation of receiving the same from

another" does any of the following, among others:

> (A) Negotiates or attempts to negotiate, or assists in procuring prospects for the listing, sale, purchase, exchange, renting, lease, or option for any real estate or of the improvements thereon; . . .

> (C) Collects rents; . . .

> (H) Performs property management services or community association management services . . . .

O.C.G.A. § 43-40-1(2). Plaintiff argues Debtor illegally acted as a broker in their transaction and

her failure to disclose the revocation of her license coupled with her representations that she was

an expert in the real estate industry with thirty years of experience supports a claim for false

pretenses.  Debtor does not deny that her broker license was revoked but argues she was not acting

as a broker in the transactions because she was not engaged in any services "for another." Rather,

Debtor argues, she was engaged in her own business ventures involving her own interest in

properties that she owned or leased.

The Court agrees with Plaintiff that she has pled sufficient facts to support a plausible claim

for false pretenses based on a failure to disclose the revocation of Debtor's real estate license.  The

Court is not prepared at this point to find Debtor was illegally engaged in broker activities, but the

Court is far from convinced that Debtor's activities were legal. Based on the allegations of the

Amended Complaint, Debtor, through Luxury Group, either owned or leased multiple properties

that Debtor then "rented" to investors. Those investors, however, had no actual right to use the

properties and instead had little more than the right to share in revenues from short term rentals to third parties. Debtor, or her company, performed all management of the properties on behalf of Plaintiff and similar investors, including collecting and distributing rental revenues, and received a relatively small portion of the rental stream in exchange for such management activities. The Court is not convinced that simply styling these transactions as joint ventures removes them from the purview of broker activities when it appears Debtor or her company were performing significant leasing activities and management services for investors like Plaintiff. Even if Debtor was not engaged in broker activities, the Court finds Plaintiff states a plausible claim that by holding herself out as a real estate expert to investors like Plaintiff, the revocation of Debtor's real estate license may have been a material fact that Debtor had a duty to disclose. Whether Plaintiff's theory will hold up on the merits at trial is another question, but the Amended Complaint states a claim for relief under § 523(a)(2)(A). The Court will deny the Motion on that claim.

B. Section 523(a)(2)(B)

Section 523(a)(2)(B) provides an exception to discharge of a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by…

> (B) use of a statement in writing--
>     (i) that is materially false;
>     (ii) respecting the debtor's or an insider's financial condition;
>     (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>     (iv) that the debtor caused to be made or published with intent to deceive."

To properly plead a claim for relief under this section, the plaintiff must show:

> [T]he debtor owes the creditor a debt for money, property, or the extension of credit that was obtained by the debtor through the use of: (1) a written statement; (2) the written statement was materially false; (3) the written statement concerns the debtor's financial condition; (4) the plaintiff reasonably relied on the statement; and (5) the debtor published the writing with the intent to deceive the plaintiff.

*Eden v. Eden (In re Eden)*, 584 B.R. 795, 808 (Bankr. N.D. Ga. 2018) (Diehl, J.) (citing *Hurston v. Anzo (In re Anzo)*, 547 B.R. 454, 465 (Bankr. N.D. Ga. 2016) (Sacca, J.)).

Defendant argues Plaintiff did not point to any written statement about Debtor's or an insider's financial condition on which Plaintiff relied to loan Debtor money. First, the statute is not limited to money loaned and includes a debt for money obtained. Plaintiff's claim is for the Deposit, Set Up Fee, and other amounts she paid to Debtor on April 15 and 16. This is money obtained even if not loaned. Though Defendant rightly points out that the contracts were between Plaintiff and Luxury Group, not Plaintiff and Debtor, the Amended Complaint alleges the funds were paid to "her," which the Court construes to mean Debtor. Further, the Amended Complaint contains allegations that the Property was with Debtor's company, which the Court construes to be Luxury Group and that Debtor owned or controlled it. Thus, any documents showing the revenue history of a property of Luxury Group would be a written document concerning the financial condition of an insider of the Debtor. *See* 11 U.S.C. § 101(31) (definition of "insider" includes corporation controlled by debtor).

The Amended Complaint alleges Debtor gave Plaintiff a document showing the Property generated over $30,000 in revenue in the first three months of 2019. The Amended Complaint later alleges that the ledger showing the Property's past performance was inaccurate and was provided to deceive Plaintiff.  The Amended Complaint could be more explicit that the allegations appearing in different portions of the Amended Complaint are talking about the same document. Similarly, the Amended Complaint fails to provide a specific date the document was given, but it is not an absolute necessity to plead the exact date. *See Tello,* 494 F.3d at 972-73.

The Amended Complaint alleges that a document showing the property generated $30,000 of revenue in 3 months was provided to Plaintiff prior to entering the contracts and proved to be

inaccurate. The Amended Complaint alleges Plaintiff relied on the document in making her decision to invest in the Property and pleads enough facts to support a claim for reasonable reliance under the circumstances. The Amended Complaint alleges Debtor provided the document with the intent to deceive Plaintiff, which can be pled generally. These allegations are sufficient to plead a claim and put Debtor on notice of the false document at issue and the circumstances supporting the claim under § 523(a)(2)(B).  The Motion will be denied on the § 523(a)(2)(B) claim.

    C.   <u>Effect of the Merger Clause</u>

Debtor makes much of the Merger Clause and that it prevents any claim of fraud. The Court disagrees for the simple fact that the Merger Clause is limited to the Hosting Agreement while nearly all Plaintiff's alleged damages arise from the Deposit and Set Up Fee, neither of which are referenced in the Hosting Agreement. The only amounts to be paid under the Hosting Agreement are the Platform Fee and monthly cleaning and service costs. Debtor asserts the Set Up Fee is governed by the Hosting Agreement but does not point to any specific provision in the Hosting Agreement that would bring the Set Up Fee under its subject matter. The Court's own review of the Hosting Agreement reveals nothing that could be construed as a Set Up Fee.  Indeed, nothing in the Hosting Agreement references, incorporates, or contemplates the Rental Agreement, the Deposit, or the Set Up Fee, and as far as the Court can tell, nothing in either contract governs or contemplates the Set Up Fee. The only reference to the Set Up Fee in the documents appears in the invoice attached after the Hosting Agreement. While the invoice does appear to have been signed on April 15 along with the other contracts, it is not clear what relationship it has with the contracts. Neither contract references or incorporates the invoice, nor does the invoice  reference

the contracts explicitly. The invoice includes line items for "Deposit," "AirBnB Platform Fee," and "Set Up Fee," but it says nothing else beyond providing an amount for each.

Even if the Merger Clause precludes Plaintiff's claims for fraud relative to the Hosting Agreement, a bare reading of the contracts does not allow application of the Merger Clause to the Rental Agreement or the Set Up Fee. The Rental Agreement is a separate agreement from the Hosting Agreement and is not incorporated or referenced at all by the Hosting Agreement or the Merger Clause. The Set Up Fee must be governed by some unspecified agreement not contemplated in either the Hosting Agreement or the Rental Agreement. The Court will not dismiss Plaintiff's claims based on the Merger Clause.

D.  Section 523(a)(4)

Section 523(a)(4) excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." The section provides three different options to except a debt from discharge, but Plaintiff must prove only one of the three to succeed. *See SmithKline Beecham Corp. v. Lam (In re Lam)*, Adv. No. 06-9096-MGD, 2008 Bankr. LEXIS 1372, at *8 (Bankr. N.D. Ga. Mar. 27, 2008) (Diehl, J.); see also *Hosey v. Hosey (In re Hosey),* 355 B.R. 311, 321 (Bankr. N.D. Ala. 2006); *In re Littleton*, 942 F.2d 551, 555 (9th Cir. 1991) (stating that "a debt can be nondischargeable for embezzlement under 523(a)(4) without the existence of a fiduciary relationship"). The Amended Complaint asserts Debtor committed all three: fraud or defalcation while acting as a fiduciary, embezzlement, and larceny.

Defendant argues Plaintiff does not allege facts to state a claim that Debtor committed fraud or defalcation while acting in a fiduciary capacity. The Court agrees. To show fraud or defalcation while acting in a fiduciary capacity, "a party must demonstrate that (1) the debtor held a position as a fiduciary; (2) the claim arose while acting in a fiduciary capacity; and (3) the

conduct rose to the level of a defalcation." *Ga. Lottery Corp. v. Owens (Matter of Owens)*, 599 B.R. 388, 393 (Bankr. N.D. Ga. 2019) (Drake, J.).  The first prong, whether a debtor held a position as a fiduciary, is a more difficult task than usually believed by plaintiffs.  It is a question of federal law, *Blashke v. Standard (In re Standard)*, 123 B.R. 444, 453 (Bankr. N.D. Ga. 1991) (citing *In re Angelle*, 610 F.2d 1335, 1341 (5th Cir. 1980)), and federal courts have consistently construed "fiduciary" narrowly for purposes of nondischargeability since at least 1844.  *See, e.g., Chapman v. Forsyth,* 43 U.S. (2 How.) 202, 208 (1844) ("The act speaks of technical trusts, and not those which the law implies from the contract."); *Guerra v. Fernandez-Rocha (In re Fernandez-Rocha)*, 451 F.3d 813, 816 (11th Cir. 2006)("[t]he Supreme Court has consistently held that the term 'fiduciary' is not to be construed expansively" (citing *Quaif v. Johnson,* 4 F.3d 950, 953 (11th Cir.1993))); *In re Standard*, 123 B.R. at 451-53 (Bankr. N.D. Ga. 1991) (discussing history of narrow construction of "fiduciary" under 523(a)(4)). "It is well established that a creditor who seeks a determination that its debt is excepted from discharge pursuant to § 523(a)(4) must prove the existence of an express or technical trust and not merely the existence and breach of a fiduciary duty." *Infinity Grp. LLC v. Lucas (In re Lucas)*, 477 B.R. 236, 242 (Bankr. M.D. Ala. 2012); *see also Quaif,* 4 F.3d at 953; *Kern v. Taylor (In re Taylor)*, 551 B.R. 506, 519 (Bankr. M.D. Ala. 2016) ("A fiduciary relationship under § 523(a)(4) requires the existence of a trust."). Not just any trust will do. "It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee *ex maleficio*. He must have been a trustee before the wrong and without reference thereto." *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934). "Accordingly, 'constructive' or 'resulting' trusts, which generally serve as a remedy for some dereliction of duty in a confidential relationship, do not fall within the § 523(a)(4) exception 'because the act which created the debt *simultaneously* created the trust  relationship.'"

*In re Fernandez-Rocha*, 451 F.3d. at 816. Instead, an express or technical trust must exist before any breach of duty. *See Quaif*, 4 F.3d at 953. Express trusts generally are voluntary trusts created by contract, *id.*, and "must generally be in writing and must express the parties' intent to create a trust, specifically define the trust property, and name both a beneficiary and a trustee." *In re Taylor*, 551 B.R. at 519.

The Complaint fails to plead any facts showing the business venture created any kind of trust relationship between Plaintiff and Debtor. Initially, Debtor was not a party to any of the contracts—Luxury Group was the counterparty. To the extent the contracts created any type of trust relationship, it was between Luxury Group and Plaintiff, not Debtor and Plaintiff. While the Court implicitly accepts Debtor could have been committing fraud through her company for purposes of the (a)(2) claims such that she is liable individually (an issue not raised in the Motion by Debtor), the Court does not believe a fiduciary relationship can be imputed to Debtor through the corporate veil, a result that too closely resembles an *ex maleficio* trust, which is not sufficient to establish fiduciary capacity under § 523(a)(4).

Moreover, the contracts do not establish the type of trust relationship required under § 524(a)(4). Nothing in the contracts expressly creates a trust, defines any trust property, or names any party as a trustee or a beneficiary. Nor do the terms imply such an arrangement. The Deposit is the only amount that arguably could have been held in trust pursuant to the contracts and for which Plaintiff asserts a claim, but the only requirement was that the deposit be returned at the end of the term of the Rental Agreement if Plaintiff did not breach the agreement. Nothing in the contracts restricts, directs, or even contemplates how the Deposit would be used or held during the term of the agreement.  The existence of a refundable deposit is not, by itself, sufficient to establish a fiduciary relationship as contemplated in § 524(a)(4). Likewise, the Set Up Fee was not subject

19

to any contractual provision whatsoever as far as the Court can tell,[5] and bare allegations that the Set Up Fee was supposed to be used for property upgrades is not sufficient to establish the type of express or technical trust required under § 524(a)(4).  If it were, then a fiduciary relationship would arise any time a creditor entrusts money to a debtor for a contemplated purpose. Such a ruling would exponentially expand the meaning of "fiduciary capacity" under § 524(a)(4).

Plaintiff also argues Debtor's role as property manager created a fiduciary relationship because, as property manager, Debtor had complete control over the Property and the finances associated therewith. Again, Debtor was not the property manager under the contracts, Luxury Group was. Even if Luxury Group's obligations could be imputed to Debtor individually, and assuming a property manager owes fiduciary obligations to its client under state law, those facts alone do not establish "fiduciary capacity" under § 524(a)(4). An express or technical trust must be established, not just a relationship whereby one party has placed its trust in another.  Other cases have concluded that property managers are not fiduciaries for purposes of § 524(a)(4) under more egregious facts than alleged here. *See Savonarola v. Beran*, 79 B.R. 493, 495 (Bankr. N.D. Fla. 1987). The Court agrees with Debtor that the Complaint fails to allege facts supporting a claim for fraud or defalcation while acting in a fiduciary capacity.[6]

Whether Debtor was a fiduciary, however, does not end the inquiry of whether Plaintiff adequately pled a claim under § 524(a)(4). No fiduciary capacity is required to establish embezzlement or larceny, *Savonarola*, 79 B.R. at 495, and the Complaint alleges Debtor committed both. Debtor does not specifically address embezzlement or larceny in the Motion.

---

[5] If the Set Up Fee was meant to upgrade the Property by purchasing new furniture, the Rental Agreement is clear that all furniture would belong to Luxury Group.

[6] Plaintiff also makes references to complaints by other creditors and Debtor's failure to pay rent to property owners as evidence of a fiduciary relationship. The Court does not understand how agreements with third parties establish that Debtor was a fiduciary to Plaintiff.

Instead, Debtor characterizes allegations in the Complaint that Debtor "stole" the Set Up Fee to be "throw away lines" because they do not appear in the body of the Complaint. Debtor further appears to argue that any allegations that the Set Up Fee was supposed to be used for property upgrades should be ignored because of the Merger Clause.

First, the Court disagrees the allegations are throw-away lines. It is true that several key allegations to Plaintiff's embezzlement and larceny claims are not stated in separately numbered paragraphs and are not pled as artfully as might be desired, but the Court must construe the Amended Complaint liberally. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (cleaned up)). Despite its formal deficiencies, the Amended Complaint alleges the Set Up Fee was to be used for a very specific purpose—upgrades to the Property to achieve AirBnB Plus Status by June 2019—and no upgrades were ever performed.  As discussed above, the Court cannot conclude the Merger Clause governs the Set Up Fee.  The question, then, is whether the allegations that the Set Up Fee was not used for its intended purpose states a plausible claim for larceny or embezzlement.

The Bankruptcy Code defines neither larceny nor embezzlement, and courts look to federal common law for their elements. *R&R Express, Inc. v. Cawthon (In re Cawthon)*, 594 B.R. 913, 922 (Bankr. N.D. Ga. 2018) (Hagenau, J.). A plaintiff may prove larceny under § 523(a)(4) "if the debtor has wrongfully and with fraudulent intent taken property from its owner." *Id.* "First, larceny requires that the original taking of property be unlawful. Second, larceny within the meaning of section 523(a)(4) requires intent. A plaintiff must show that the defendant took property 'with the intent to convert it or to permanently deprive the owner of it.'" *Id.* (citations omitted); *See also Tower Oak v. Selmonosky (In re Selmonosky)*, 204 B.R. 820, 828 (Bankr. N.D.

Ga. 1996) (Brizendine, J.) (holding that plaintiff must show that debtor unlawfully took and carried away property belonging to another with intent to permanently deprive owner of same to establish larceny).

On the other hand, "[e]mbezzlement is the fraudulent conversion of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Cawthon*, 594 B.R. at 922. In contrast to larceny, which requires an unlawful taking, "the original taking of the property was lawful or with the consent of the owner." *Id.* To establish embezzlement, the plaintiff must show (1) property owned by another that is rightfully in the possession of the debtor; (2) the debtor appropriates the property for personal use; and (3) the appropriation occurred with fraudulent intent. *Cook v. Knight (Matter of Knight)*, 621 B.R. 529, 537 (Bankr. N.D. Ga. 2020) (Drake, J.); *In re Pervis*, 512 B.R. 348, 366 (Bankr. N.D. Ga. 2014) (Hagenau, J.). Importantly, "Rule 9's heightened pleading standard does not apply to allegations of embezzlement or larceny under this section." *See Presley*, 490 B.R. at 639.

It is a close call, but the Court finds the Amended Complaint pleads enough facts to infer a plausible claim for either larceny or embezzlement. The Amended Complaint alleges the Set Up Fee was to be used to perform upgrades to the Property and such upgrades were to be done immediately. The Amended Complaint further alleges the upgrades never took place. Standing alone, these two allegations might not be enough to show Debtor wrongfully took or appropriated the Set Up Fee to her own use with fraudulent intent, but the overall picture painted by the Amended Complaint shows a Debtor with a revoked real estate license selling investments in poorly drafted, convoluted, "arbitrage" lease and sublease agreements in which Debtor or her company obtains substantial up-front fees to upgrade, manage, and rent out luxury properties, but the properties' represented past revenues were false and the promised upgrades were not

performed. The Court's experience and common sense tells it that if those facts can be proven at trial, they support a plausible claim that Debtor wrongfully took or appropriated Plaintiff's Set Up Fee with fraudulent intent. The Court will deny the Motion as to claims of larceny and embezzlement under § 523(a)(4).

E. Non-Dischargeability Pursuant to § 523(a)(6)

Section 523(a)(6) states that a debt may be excepted from discharge "for willful and malicious injury by the debtor to another entity or to the property of another entity." To show "willfulness," a plaintiff must make "'a showing of an intentional or deliberate act, which is not done merely in reckless disregard of the rights of another.'" *Maxfield v. Jennings (In re Jennings)*, 670 F.3d 1329, 1334 (11th Cir. 2012) (citing *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1163 (11th Cir.1995)); see also *Wells Fargo Bank, N.A. v. Sutton (In re Sutton)*, 557 B.R. 831, 836 (Bankr. N.D. Ga. 2016) (Ellis-Monro, J.) (citing *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)) ("An injury is willful when the injury itself was 'deliberate or intentional' and not merely the result of an intentional act that resulted in injury."). This standard requires a debtor commit "an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." 670 F.3d at 1334. The Eleventh Circuit has defined "malicious" as "'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will.'" *Id*. (citing *In re Walker*, 48 F.3d at 1164). "[S]pecific intent to harm another is not necessary" to establish malice. *Id*. Both willfulness and maliciousness must be shown.

Debtor contends Plaintiff's allegations that Debtor engaged in false representations are insufficient under this section. Debtor must have intended to inflict a willful and malicious injury

on Plaintiff as well. Because Plaintiff does not sufficiently allege Debtor's intent, Debtor requests the Court dismiss Plaintiff's claims under § 523(a)(6).

Like the larceny and embezzlement claims, this is a close call, but the Court again disagrees with Debtor. The fact that Debtor may have committed some type of fraud, even a willful and malicious fraud, does not by itself support a finding of willful and malicious injury. *See Eden v. Eden (In re Eden)*, 584 B.R. 795, 809 (Bankr. N.D. Ga. 2018) (quoting *IndyMac Bank, F.S.B. v. Mitchell (In re Mitchell)*, 2005 Bankr. LEXIS 1924 at *9 (Bankr. N.D.Ga. Aug. 16, 2005)). The Amended Complaint, however, alleges Debtor "intended to inflict damage on Plaintiff . . . ." By itself, such an allegation might fall under the category of an unadorned recitation of a legal element not sufficient to state a claim. But, intent can be pled generally, and the Amended Complaint includes substantial facts alleging Debtor obtained Plaintiff's investment under false pretenses, using falsified past revenues, and making unfulfilled promises to upgrade the Property. The Amended Complaint also pleads a broader pattern of malfeasance in Debtor's dealings with other parties. All of these facts taken together, assuming they are true, support the reasonable inference that Debtor knew or was substantially certain that Plaintiff's investment would fail and that there was no just reason to accept the Deposit, Set Up Fee, and Platform Fee.

Other facts in the Amended Complaint, however, support the opposite inference—that Debtor, despite employing fraudulent and wrongful tactics to earn the investment in the first place, truly believed or intended Plaintiff would earn her money back. Such facts include that this was a real investment that Debtor appears to have managed, rented out, and distributed revenues to Plaintiff. Further, Debtor made efforts to return some portion of Plaintiff's investment through settlement discussions that were rejected by Plaintiff. It could also be that Debtor did not know either way and was indifferent, perhaps recklessly so, to whether the Property would perform well

enough to earn Plaintiff's investment back. In either of those cases—genuine belief in success or ignorant indifference—a claim for willful and malicious injury would not lie. Which conclusion will prevail is a factual determination not to be decided at the pleadings stage as the Court must draw all inferences in the light most beneficial to Plaintiff.  Thus, the Motion will be denied on the § 523(a)(6) claims.

F.  Denial of Discharge Pursuant to § 727

Finally, Debtor requests the Court dismiss any objection to discharge brought under § 727(a)(7) or (a)(4). The Court easily agrees with Debtor here. Paragraph 3 of the Amended Complaint states: "This is an action under 11 U.S.C.A. § 727(a)(4), 11 U.S.C.A. § 727(a)(7), and 11 U.S.C.A. §523(a)(2)-(6), objecting to the discharge of the Defendant/Debtor." The next paragraph provides that Plaintiff had investigated Debtor's action and was satisfied grounds existed for denial of discharge, with such ground beings set forth in the following paragraphs. Thereafter, Plaintiff makes no reference whatsoever to § 727. Plaintiff's prayer for relief simply requests: "The Defendant/Debtor be denied a discharge for the reasons alleged in the above and foregoing Complaint and the Defendant/Debtor be required to pay the Plaintiff/Creditor on the debt that is owed."

Section 727(a)(4) and (7) deal with certain conduct of debtors in an underlying bankruptcy case or other bankruptcy cases. The only allegations about Debtor's conduct in her chapter 7 case or any other bankruptcy case are that the United States Trustee filed a notice on the docket in the chapter 7 case that debtor had not transmitted all documents necessary to conduct the means test.[7] From the foregoing, the Court cannot discern what allegations form the basis of any objection to

_____

[7] The United States Trustee subsequently filed a notice that Debtor did transmit the necessary documents.

discharge under § 727 under any pleading standard. Therefore, the Court finds Plaintiff failed to state a claim for relief under § 727 and accordingly dismisses those claims.

## V.    CONCLUSION AND ORDER

For the foregoing reasons,

**IT IS HEREBY ORDERED**, the Motion is **Granted in Part and Denied in Part** as follows:

- The Motion is DENIED as to Plaintiff's claims under § 523(a)(2)(A) and (B), claims for larceny and embezzlement under § 523(a)(4), and claims under § 523(a)(6);

- Plaintiff's claims for fraud or defalcation while acting in a fiduciary capacity under § 523(a)(4) and objection to discharge under § 727 are hereby dismissed without prejudice, provided that Plaintiff, if she chooses,[8] may file an amended complaint no later than 21 days from the date of entry of this Order.

- If Plaintiff files a further amended complaint within 21 days of the date of entry of this Order, Debtor shall have 14 days from the date of service of such amended complaint to file an answer. If no amended complaint is filed within 21 days of entry of this Order, Debtor shall have 35 days from the date of entry of this Order to file an answer to the Amended Complaint as currently filed.

END DOCUMENT

---

[8] While Plaintiff may file an amended complaint if she believes she has a factual basis to pursue claims dismissed by this Order, she is under no obligation to do so. If no amended complaint is filed, the litigation will proceed on the claims in the Amended Complaint not dismissed by this Order.

DISTRIBUTION LIST

**Shannan M. Young**
4956 Whiteoak Walk SE
Smyrna, GA 30080

**Adrian Marie Wells-Lucas**
832 Red Hart Lane
Alpharetta, GA 30004

**Will B. Geer**
Wiggam & Geer, LLC
Suite 1150
50 Hurt Plaza SE
Atlanta, GA 30303

**Edwin K. Palmer**
P.O. Box 1284
Decatur, GA 30031

**Thomas Wayne Dworschak**
Office of the U. S. Trustee
Room 362
75 Ted Turner Drive, SW
Atlanta, GA 30303